CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

FEB 2 0 2009

JOHN F. CORCORAN, CLERK
BY: _____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JONATHAN LEE GRAHAM,<br>Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:08-cv-260 |
| | ) | |
| KEITH DUNAGAN, et al., | ) | By: Hon. Michael F. Urbanski |
| Defendants. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Jonathan Lee Graham ("Graham"), a Virginia prisoner proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his civil rights by falsely arresting him, using excessive force during his arrest, and maliciously prosecuting him. Graham names as defendants Keith Dunagan, Chief Deputy for the Wythe County Sheriff's Office; Ray Danner, a deputy for the Wythe County Sheriff's Office; Ronald Gillenwater, a former deputy for the Wythe County Sheriff's Office; James Harrington, Wytheville police sergeant; and Leigh Ann Watson, a Wytheville police officer. Defendants filed motions to dismiss and motions for summary judgment. Graham filed timely responses, making the matter ripe for disposition. On December 22, 2008, this matter was referred to the undersigned for a report setting forth findings of fact and conclusions of law and a recommended disposition. An evidentiary hearing was held on February 9, 2009. For the reasons set forth herein, it is

**RECOMMENDED** that defendants' motion to dismiss Graham's Eighth Amendment claim be **GRANTED**; defendants' motion for summary judgment as to Graham's Fourth Amendment claim be **GRANTED**; and that this case be **DISMISSED**.

# I.    Graham's Factual Allegations and Evidence.

## A.    Allegations of Graham's Pro Se Complaint.

Graham alleges that on August 14, 2006, at around eleven o'clock at night, he was walking toward his residence and sat down on a guardrail for a moment. Graham noticed that a car was coming directly toward him, and he jumped over the guardrail and scrambled up a small embankment to avoid being struck. Wythe County Sheriff's Deputy Ray Danner ("Danner") exited the car, drew his sidearm, and ordered Graham to lie on the ground. Graham complied, and several more officers arrived at the scene. While on the ground, Graham alleges that former Wythe County Sheriff's Deputy Ronald Gillenwater ("Gillenwater") sat on his back causing Graham to have trouble breathing. Gillenwater told Graham he would be alright, but Graham reiterated he could not breathe and began to struggle to get the officer off his back.

As a result of Graham's struggling, Chief Deputy Keith Dunagan ("Dunagan") began striking Graham's head with a heavy-duty metal flashlight, and another officer said, "mace him." Gillenwater, still sitting on Graham's back, pulled Graham's head backwards and maced his face. Graham continued to struggle after being maced and hit. Dunagan struck Graham's head with his flashlight and fists so hard that he broke both his hand and the flashlight. Eventually, Graham was dragged down the embankment and was taken to the Wythe County Community Hospital, where he remained for several days. After being released from the hospital, Graham was charged with a number of offenses relating to the incident, including trespassing, malicious wounding of a law enforcement officer, assault and battery on law enforcement officers, resisting arrest and obstruction of justice.

2

## B.    Graham's Evidence at State Suppression Hearing.

At the suppression hearing held in the Wythe County Circuit Court on June 28, 2007,

Graham presented evidence from Sarah Plummer, the mother of Graham's second child, who

testified that on the night in question, she became concerned about Graham after he had run out

of his trailer.  Plummer stated that her concerns were motivated by Graham's mental state as he

had been drinking and had not been taking his medications, which apparently were to deal with

psychotic symptoms, including schizophrenia.[1]  Plummer testified that she heard Graham "saying

things" on Route 21 and saw him jump over a guardrail and begin running.  Plummer stated that

she could not remember what Graham was saying, could not recall whether he had his shirt on or

not and did not see him go out into the road.  At some point, Plummer left the scene and went

back to the trailer to retrieve her cell phone.  Plummer said that she heard the police "holler" at

Graham to freeze or stop, and Graham got down on the ground "spread eagle."  Plummer

testified that the police handcuffed Graham's hands behind his back and then "hog-tied" his

ankles to his hands.  She also noted that while on his stomach the police dragged him from the

grass across a driveway and threw him in a ditch.  As he was lying face down, Graham began to

complain that he could not breathe.  Plummer saw Graham bite an officer on his knuckle; the

officer exclaimed that he was going to charge Graham for assault and battery.  Plummer stated

that she saw an officer hit Graham in the head with his mag type flashlight and another one hit

---

[1] Plummer testified that one medicine Graham was prescribed was Seroquel, which is used to treat schizophrenia and bipolar disorder.  At the federal evidentiary hearing, Graham testified that he was prescribed Seroquel, along with Trazodone (an antidepressant) and Depakote (used to treat the manic phase of bipolar disorders).

3

Graham in the head with his fists. Plummer said that she did not see Graham flail or attempt to kick the officers. (Suppression Hrg. Tr. ("Supp. Hrg.") 6-42, June 28, 2007)

### C.  Graham's Evidence at State Sentencing Hearing.

At his sentencing hearing on February 27, 2008,[2] Graham testified that on the night in question, he had been drinking and smoking crack cocaine and started hallucinating that someone was trying to kill him. Graham said that he ran up a couple of people's driveways to ask for help, beating on people's doors. Graham said he fell and lost his glasses and that he is legally blind without them. Graham said he was sitting on a guardrail trying to calm himself down when he saw approaching lights. Graham explained:

> And I got . . . and I thought that somebody was trying to do something to me and when I saw the lights come over here, I was thinking to get out of the road or get off the side of the road so I wouldn't get hit. That's when I jumped over the guardrail and Mr. Danner, I guess, that's what the lights turned out to be, was parked right there. He had his weapon drawn, told me to get . . . I didn't hear him the first, but he told me to get on the ground. I laid down on the ground. He got his gun pointed at me talking about I wasn't complying. And . . . and I . . . he was like move your hands where I can see them. He did ask me, but I'm thinking he . . . he got his gun pointed at me so I was scared that he was going to shoot. This is what I was thinking, that he was going to shoot me if I moved my hand like I'm reaching for something. And I was like I'm right here, I'm not doing anything and the next thing you know, officers were around me and they had something, I guess, it was the flashlight in my face and I'm thinking that they were trying to do something to me.

(Sentencing Hrg. Tr. ("Sent. Hrg.") 149, Feb. 27, 2008) While on the ground, Graham could not breathe and started to panic. Graham stated that "[w]hat I remember is that I couldn't breathe

---

[2] On October 4, 2007, Graham pled guilty to three felony counts of assault and battery of a law enforcement officer, one felony count of malicious wounding of a law enforcement officer, one misdemeanor count of obstructing justice and one misdemeanor count of resisting arrest. (Plea Hrg. Tr. ("Plea Hrg.") 96-114, Oct. 4, 2007)

4

and I scratched his legs and I got my hands hit with a flashlight. Somebody pulled my head back to mace me and I slapped at them and I think that was Chief Dunagan and he said this son of a bitch bit me and he started hitting me with his flashlight. And after he hit me with the flashlight, he started hitting me with his fists. And that's all I remember being drugged down the hill and the next thing you know, I'm in the hospital . . ." (Sent. Hrg. 150-51)

### D.    Graham's Evidence at Federal Evidentiary Hearing.

At the evidentiary hearing on February 9, 2009, Graham explained that he was "sticking to [his] original story," i.e., that he did not assault the officers; was brutally attacked and beaten up; never bit Dunagan; and all of the officers are lying. Graham explained that on August 14, 2006, he ran out of his trailer "paranoid, panic stricken and seeking help" and went to several residences asking for assistance. When no one came to the door, he headed back to his trailer. Stopping at the guardrail to rest, he saw headlights on the crest of the hill and got "paranoid" and jumped over the guardrail. The officer drew his weapon and ordered Graham to the ground, and Graham stopped and got down. The officer complained that he was not complying, but Graham replied he was not doing anything. Graham stated that other officers arrived within five minutes, and an officer, believed to be Gillenwater, sat on his back, causing Graham not to be able to breathe. Graham admitted that he "snapped" with his teeth at an officer's hand in his face, and he was then hit in the head with fists and a flashlight. Graham testified that he was dragged down the hill, four-way tied and taken to the hospital. Graham also admitted that he had been smoking rock cocaine, taking several prescribed antipsychotic medications, and drinking both liquor and beer. Graham testified that although he pled guilty to several offenses, he was innocent.

5

## II.     Defendants' Factual Position and Evidence.

### A.     Defendants' Evidence from Summary Judgment Affidavits.

Late on the evening of August 14, 2006, Dunagan was advised by his wife that a man was

running up their driveway, screaming that someone was trying to kill him.  Dunagan told his wife

to call dispatch, and he went outside to look for the man.  He did not see or hear anyone, but he

went back inside his house to retrieve his firearm and a flashlight.  Dunagan then went back

outside to look for the man.  Dunagan heard a person shouting nearby and walked through some

high grass toward that area.  He then saw a car coming toward his location and an unknown man,

Graham, crossing the road from Dunagan's property into the Galilee Church yard.  (Dunagan

Aff. 1-2)

Deputy Danner was driving the car and responding to the wife's call to dispatch.[3]

(Dunagan Aff. 2)   Danner saw Graham run across the road, jump over a guardrail, and run into a

ditch and up a slope into the Galilee Church yard, screaming the entire time that someone was

trying to kill him.  (Danner Decl. 1)   Danner stopped his cruiser near Graham, exited the vehicle,

identified himself as a Wythe County deputy, drew his sidearm, and ordered Graham to lie on the

ground.  (Danner Decl. 1; Dunagan Aff. 2)  Graham complied with the order after Danner

repeated it several times.  (Danner Decl. 2; Dunagan Aff. 2)  Danner then recognized Graham

from his previous law enforcement encounters.  (Danner Decl. 1)

As this occurred, Dunagan crossed the road from his property to the church's property

and approached Graham's right side.  (Dunagan Aff. 2)  Dunagan told Danner that he would

---

[3] Danner states that he received the order from dispatch at approximately 11:40 p.m. and arrived at the
scene at approximately 11:57 p.m.  (Danner Decl. 1)

6

cover him as Danner attempted to handcuff Graham. Danner holstered his sidearm and approached Graham to handcuff him. (Danner Decl. 2) Graham began to resist being handcuffed, so Dunagan assisted Danner.[4] (Danner Decl. 2; Dunagan Aff. 2) Graham began biting, kicking, and head-butting them. (Danner Decl. 2; Dunagan Aff. 2) Graham bit Dunagan on the right arm, releasing his bite only after Dunagan forcibly pulled his arm away and struck Graham several times in the shoulder and head. (Danner Decl. 2; Dunagan Aff. 2) Graham also bit Dunagan on the left forearm, breaking the skin. (Danner Decl. 2; Dunagan Aff. 2)

At some point during the nearly thirty-minute struggle, Danner radioed for backup, and eventually, the remaining defendants arrived at the scene. (Danner Decl. 2) Wytheville Police Officer Leigh Ann Watson ("Watson")[5] arrived first, at approximately 12:10 a.m., and Wytheville police sergeant James Harrington ("Harrington") arrived moments later. (Watson Aff. 1; Harrington Aff. 1) Watson retrieved extra restraints to bind Graham's feet to his hands so he would not be able to kick out the windows of the patrol car during transport to the hospital. (Watson Aff. 2; Harrington Aff. 1)

The defendants sought to place Graham in handcuffs and leg irons, and during this process, Graham tried to bite the defendants. (Watson Aff. 2; Danner Decl. 2; Dunagan Aff. 2) Wytheville County Sheriff's Sergeant J. P. Thompson ("Thompson") arrived at this time, at approximately 12:20 a.m. (Thompson Aff. 1) Graham continued to be combative. (Danner Decl. 2-3; Thompson Aff. 1) Thompson, Danner, Gillenwater, Watson, and Harrington recuffed

---

[4] Presumably, Dunagan was not wearing any clothes identifying him as a law enforcement officer because Watson states in her affidavit that Danner was assisted by "a citizen." (Watson Aff. 1) She was the first "backup" officer to arrive, and nobody else claims a citizen was involved.

[5] Since the events of this case, Watson has married and her name is now Leigh Ann Watson Altizer.

Graham so his hands would be fastened behind his back instead of fastened in front of his torso. (Thompson Aff. 1) While being recuffed, Graham clawed Thompson and bit Harrington through his gloves. (Harrington Aff. 2; Thompson Aff. 1) Graham also kicked Watson in the legs, "causing bruising and a raised knot." (Watson Aff. 2) Graham unsuccessfully tried to throw a small rock at Harrington's face. (Harrington Aff. 2) Watson transported Graham to the hospital. (Watson Aff. 2)

## B. Defendants' Evidence at State Suppression and Sentencing Hearings.

Danner and Dunagan testified consistently at the June 28, 2007 suppression hearing and the February 27, 2008 sentencing hearing. Danner testified that he got a call to go and assist Chief Deputy Dunagan with a subject who was around his residence hollering for help. As Danner approached the Galilee Church in his patrol car, he saw a black male subject run across the road in front of him and jump over the guardrail. Danner stopped his vehicle in the road, identified himself and asked the subject to stop. Danner repeated his command and the subject did not stop, and instead ran away from the guardrail, up the bank and into the church yard. Danner recognized the subject as Graham, as he had dealt with him before, and asked him to lay on the ground. Graham did not initially comply with the command, but eventually got on the ground. Danner testified that Graham was unsteady on his feet, sweating profusely and acted "like he was almost out of his mind." (Supp. Hrg. 61) At the sentencing hearing, Danner described Graham's mental state as follows: "He was out of it. He was delusional. Just screaming help me, help me. Somebody's trying to kill me just over and over again." (Sent. Hrg. 141) Once on the ground, Graham began putting his hands in and out of his waistband, all the while hollering that somebody was trying to kill him and to help him. Danner stated that he

8

did not know whether Graham had something in his waistband and attempted to handcuff

Graham for his and Graham's safety. Danner holstered his pistol[6] and touched Graham's hand to

attempt to handcuff him. When he did so, Graham resisted, resulting in a prolonged scuffle.

Danner described the difficulty in handcuffing Graham as follows:

> Once I . . . once the Chief made the decision and gave me . . . that he
> was ready as cover, I attempted to handcuff Mr. Graham. When I
> reached for Mr. Graham's left arm, he resisted. The entire fight lasted
> anywhere from twenty-eight to thirty minutes. We were . . . we were
> bitten. He head butted us. He kicked us in the groins. He bit the
> Chief Deputy's arm to the point where the blood was out of his arm.
> Repeatedly rolled. He got to it . . . He was . . . his hair was slickly
> shaven. He was . . . the man was sweating profusely, no shirt on, a
> pair of shorts and shoes on. There was nothing you could hold on to.
> We rolled and we continued to roll. We tried (inaudible) compliance.
> We tried to hold on. I even announced pepper sprayed and he was
> pepper sprayed with no effect. At that point, we just continued to
> fight to the point where, we even at one point, the Chief took his side
> arm and his radio and laid it up in the grass away from us in a safe
> area. I holstered everything that I had and we just honestly tried to
> keep the handcuffs to put them on him. It was a struggle. We were
> hit in the face, like I say, we were hit in the groin area, we were bit.
> I was bitten, according to the ER, I had counted eleven human bites
> on my arm. The Chief was bitten to the point where it broke his skin.
> He actually broke his hand in the battle. The fight went on from, if
> I had to guess, we probably fought and rolled somewhere around 50
> feet down a bank. We . . . after about twenty-eight minutes into the
> fight, we finally felt comfortable enough where I had tried getting on
> the radio and ask for help and that's when the Town officers came.

(Supp. Hrg. 65-66)

Danner testified he did not see Sarah Plummer until after the fight was over and Graham

was being loaded in the police car. (Supp. Hrg. 53) Danner sustained a number of injuries in the

---

[6] Danner testified that he drew his firearm because Graham was hollering that someone was trying to kill him, and "I didn't know if someone was actually trying to kill him. I didn't know if someone was in the bushes. . . ." (Supp. Hrg. 54)

9

fight with Graham, including eleven bite marks on both arms and "numerous scratches, bruises, just all over my arms and legs and my neck." (Sent. Hrg. 139)

Chief Deputy Keith Dunagan testified consistently with Danner at the suppression hearing that "Graham was just thrashing around. He'd try to head butt us. He pinched us. He bit us repeatedly. Tried to kick me in the groin one time. Punched us as well. I mean, it was just continuous." (Supp. Hrg. 84) At the sentencing hearing on February 27, 2008, Dunagan testified that Graham was biting Danner so "I stuck my arm underneath his head and tried to pull him, made him let go of Deputy Danner then he bit my arm." (Sent. Hrg. 134) Dunagan continued:

> His face was like towards me originally and I was hitting him in the jaw area and then when he turned his head back the other way where it had been face down, he didn't let go of my arm. He just drug it underneath him, which made it hurt even more and I hit him in the back of the head and that's when I broke my hand.

(Sent. Hrg. 134-35) Dunagan also acknowledged that he hit Graham with his flashlight, after which it "quit working." (Sent. Hrg. 135) During the scuffle with Graham, Dunagan sustained numerous bite marks, one requiring stitches, and a broken hand. (Sent. Hrg. 129)

### C.  Defendants' Evidence at Federal Evidentiary Hearing.

At the evidentiary hearing on February 9, 2009, Chief Deputy Keith Dunagan, former Deputy Ronald Gillenwater, police officer Leigh Ann Watson, and police sergeant Jim Harrington testified. Dunagan noted multiple times that Graham was "delusional" and "combative" throughout the incident, and that Graham smelled of alcohol. Dunagan explained that the struggle began when he told Danner to cuff Graham, and that during that struggle, no officer sat on Graham. Dunagan testified that Graham, using his teeth, clamped onto Dunagan's arm and would not let go. Dunagan responded by beating Graham in the jaw first with his hand

and then, after he broke his hand, with a flashlight. Ultimately, Graham took "a chunk of meat" out of Dunagan's left arm; the injury required three to four stitches. Dunagan broke the bulb in his flashlight during the fight.[7] When questioning Dunagan, Graham alleged that he did not bite Dunagan on the arm.

Former Deputy Gillenwater testified that he was one of the last officers to arrive, after the town officers. Gillenwater recounted that when he arrived at the scene, Graham's hands were already cuffed in front. A decision was made to recuff his hands behind his back. Gillenwater assisted with that task and in doing so, was bitten by Graham on the finger. Gillenwater had gloves on, so his skin was not broken. Gillenwater testified that he never sat on Graham.

Officer Watson then testified that she had never seen a human being act as Graham did that night. She described Graham as "combative," "raging," and "delusional," noting that he screamed "get off me" at points when nobody was even touching him. Watson described Graham as being so agitated that at one point he began pounding his own head into the gravel, injuring himself. Watson described the injuries she sustained during the struggle. Graham bit her gloved finger and kicked her leg below the knee. Watson had several yellow bruises and knots in her shin area that healed in about a week. Watson noted that the officers pleaded with Graham to settle down, but those pleas did no good, either because he did not hear them or chose to ignore them.

Sergeant Harrington also testified that he did not see any officers sit on Graham's back or knee him. Harrington noted that there had been discussion about the safest way to transport Graham. His fear was that Graham would kick the window out of a patrol car, so a decision was

---

[7] Dunagan stated that he still has the flashlight and continues to use it after replacing the bulb.

11

made to shackle his hands and legs together.  Harrington, who wore gloves, also was bitten on

the hand by Graham.  Harrington called Graham "delusional," and noted the "strong order of

alcohol" coming from Graham's body.  Harrington explained that he tried to calm Graham down

by using Graham's nickname and stating that nobody was going to hurt him, but his efforts were

to no avail.

### III.     Underlying State Criminal Proceedings.

The Circuit Court of Wythe County held a suppression hearing on June 28, 2007, and the

circuit judge denied Graham's motion, noting in particular the evidence concerning Graham's

irrational mental state.  (Supp. Hrg. 94-95)  On October 4, 2007, Graham pled guilty to three

felony counts of assault and battery of a law enforcement officer in violation of Va. Code § 18.2-

57 (prohibiting "an assault and battery against another knowing or having reason to know that

such other person is a . . . law-enforcement officer"); one felony count of malicious wounding of

a law enforcement officer in violation of Va. Code § 18.2-51.1 (prohibiting  "maliciously

caus[ing] bodily injury to another by any means . . . with intent to maim, disfigure, disable or kill,

and knowing or having reason to know that such other person is a law-enforcement officer"); one

misdemeanor count of obstruction of justice in violation of Va. Code § 18.2-460 (prohibiting

"any person without just cause knowingly obstruct[ing] a . . . law-enforcement officer in the

performance of his duties"); and one misdemeanor count of resisting arrest in violation of Va.

Code § 18.2-479.1 (prohibiting "intentionally prevent[ing] or attempt[ing] to prevent a law-

enforcement officer from lawfully arresting him, with or without a warrant").  The Circuit Court

sentenced Graham, and the Court of Appeals of Virginia denied his direct appeal.  Graham's

direct appeal to the Supreme Court of Virginia is still pending.

12

## IV.  Graham's Legal Claims.

In his original pro se complaint, Graham claimed that the defendants violated his federal constitutional rights, manifest in the First, Fourth, Eighth, and Fourteenth Amendments, as follows:

1. Danner used his sidearm to order Graham to the ground for no reason;

2. Gillenwater used excessive force when he sat on Graham, thereby restricting his breathing and causing him to struggle;

3. Dunagan used excessive force while Graham was on the ground;

4. Harrington maliciously prosecuted Graham and caused his false arrest to cover up the other defendants' unconstitutional acts; and

5. Watson maliciously prosecuted Graham and caused his false arrest to cover up the other defendants' unconstitutional acts.

(Compl. 7 )  In his sixth claim, titled "negligence," Graham alleges that each defendant violated the law by allowing Graham to be beaten in each other's presence.  Graham requests $100,000.00 compensatory damages; a $150 per diem for each day he spent incarcerated; the defendants' impeachment from any law enforcement duties; and that his relevant criminal convictions be expunged.

On July 1, 2008, Graham filed a second motion to amend his complaint[8] to withdraw his First and Fourteenth Amendment claims, leaving only his Fourth and Eighth Amendment claims for unlawful search and seizure and excessive force.  A party may only amend its pleading a

---

[8] Graham's first motion to amend to add the Superintendent of the New River Regional Jail as a defendant was denied on April 8, 2008.

13

second time if the party has the opposing parties' written consent or leave of court. Fed. R. Civ. Pro. 15(a)(2). The court should freely give leave when justice so requires. Id. The defendants oppose the amendment, and defendants Harrington and Watson also renew their joint motion to dismiss because Graham does not name them in the caption of his second motion to amend. After reviewing Graham's filings, the court does not construe Graham's motion to amend as abandoning his claims against Harrington and Watson. See Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (stating courts should liberally construe pro se complaints). Accordingly, in a separate order entered this day, the court **GRANTS** Graham's second motion to amend his complaint to narrow his claims of relief to unlawful seizure, arrest and excessive force against all defendants in violation of the Fourth and Eighth Amendments.

## V.     Defendants' Motion to Dismiss Graham's Eighth Amendment Claims.

A complaint fails to state a claim upon which relief can be granted when no relief is available under any set of facts that could be proven consistent with the allegations of the complaint. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002); see Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) (stating that, while the complaint need not provide detailed factual allegations, the basis for relief in the complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" and specifically explaining that, the Twombly analysis does not run counter to Swierkiewicz or impose a heightened pleading standard); Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 170 (4th Cir. 2007) (quoting Swierkiewicz, 534 U.S. at 514, for the proposition that "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").

14

Graham is not eligible for any relief under the Eighth Amendment. Eighth Amendment

protections begin after a person is convicted of a crime. See Rish v. Johnson, 131 F.3d 1092,

1096 (4th Cir. 1997) ("The Eighth Amendment prohibits the infliction of cruel and unusual

punishment on one convicted of a crime."). In this case, Graham requests relief from actions

taken during the course of his arrest and prior to his conviction. It is well established that

"claims that law enforcement officers have used excessive force . . . in the course of an arrest,

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment . . . ." Graham v. Conner, 490 U.S. 386, 395 (1989). Accordingly, it is

**RECOMMENDED** that Graham's Eighth Amendment claims be dismissed for failing to state a

claim upon which relief may be granted.

### VI.     Defendants' Motion for Summary Judgment as to Graham's Fourth Amendment Claims.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly

granted if "there is no genuine issue as to any material fact and the . . . moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment should be granted by

the court, "only where it is perfectly clear that no issue of fact is involved and inquiry into the

facts is not desirable to clarify the application of the law . . . ." Charbonnages de France v.

Smith, 597 F.2d 406, 414 (4th Cir. 1979) (internal quotations omitted). For a party's evidence to

raise a genuine issue of material fact to avoid summary judgment, it must be "such that a

reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment,

15

the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

Section 1983 imposes civil liability on any person acting under color of law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. In this case, Graham alleges that defendants deprived him of his Fourth Amendment rights when the officers detained and arrested him without probable cause using excessive force.

Defendants contend that they are entitled to qualified immunity with respect to Graham's § 1983 claims. Qualified immunity protects government officials from civil damages in a § 1983 action "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The United States Court of Appeals for the Fourth Circuit has emphasized that qualified immunity protects law enforcement officers from "bad guesses in gray areas" and it ensures that they may be held personally liable only "for transgressing bright lines." Maciariello v. Summer, 973 F.2d 295, 298 (4th Cir. 1992).

Until last month, courts were instructed to follow a rather rigid two-pronged inquiry to determine the applicability of a qualified immunity defense. Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from in Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). Under Saucier, courts asked a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show [that] the officer's conduct violated a constitutional right?" Id. "If the answer to this inquiry is 'no,' the analysis ends and the plaintiff cannot prevail." Gomez v. Atkins, 296 F.3d 253, 261 (4th Cir. 2002). "If the answer is 'yes,' [the court] must then consider

16

whether, at the time of the violation, the constitutional right was clearly established, that is, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 201-02)). In light of Pearson, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S. Ct. at 818.

### A.   Initial Seizure.

Graham's first § 1983 claim is that Danner violated the Fourth Amendment by ordering him at gunpoint to stop and lay on the ground. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. The United States Supreme Court has analyzed Fourth Amendment seizures based upon "'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)). To determine if a seizure is reasonable, the court must "balance . . . the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" Mimms, 434 U.S. at 109 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).

Before he pled guilty to assault and battery, malicious wounding, obstruction of justice and resisting arrest, Graham challenged the constitutionality of his initial seizure by Danner at the June 28, 2007 suppression hearing in the Wythe County Circuit Court. Graham was not successful in convincing the state court that the initial seizure of his person violated the Fourth

17

Amendment.  Graham appealed his judgment to the Virginia Court of Appeals, which denied his appeal, and Graham's subsequent appeal to the Virginia Supreme Court is pending.

The first issue to be addressed, therefore, is whether a federal court may hear this claim in a § 1983 action or whether it is barred by Heck v. Humphrey, 512 U.S. 477 (1994).  In Heck, the Supreme Court held as follows:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486-87.  Graham argued in Wythe County Circuit Court that his initial personal seizure by Danner violated the Fourth Amendment and lost on that point.  His case is now on appeal.  To date, Graham's conviction is intact, as there has been no ruling reversing his conviction.  Any finding by a federal court in this § 1983 suit that the initial seizure of Graham violated his civil rights would necessarily call into question his extant criminal conviction.  As such, Graham's § 1983 claim is barred under Heck.  In footnote 6 of its opinion, the Court took pains to explain that a claim such as the one brought by Graham is barred.  The Court noted:

> An example of this latter category – a § 1983 action that does not seek damages directly attributable to conviction or confinement but

whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful – would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest. (This is a common definition of that offense. See People v. Peacock, 68 N.Y.2d 675, 505 N.Y.S.2d 594, 496 N.E.2d 683 (1986); 4 C. Torcia, Wharton's Criminal Law § 593, p. 307 (14th ed. 1981).) He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, see n. 2 *supra*, the § 1983 action will not lie.

512 U.S. at 486 n.6. Therefore, Graham's claim that his initial seizure violated § 1983 is plainly barred under Heck.[9]

### B.  False Arrest and Malicious Prosecution.

Graham next claims that he was falsely arrested and maliciously prosecuted to cover up the unconstitutional seizure. The Fourth Amendment prohibits only unreasonable seizures. "As a general rule, after initial questioning, any further detention . . . is reasonable for Fourth Amendment purposes only if it is 'based on consent or [on] probable cause [for arrest].'" Figg v. Schroeder, 312 F.3d 625, 636 (4th Cir. 2002) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 882 (1975)). An officer has probable cause for arrest if, "at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984). For an officer to have probable cause to arrest, he

---

[9] In Wallace v. Kato, 549 U.S. 384 (2007), the Supreme Court considered the impact of the running of the statute of limitations on § 1983 claims barred by Heck. In Virginia, the statute of limitations for personal actions for damages arising out of the same facts as a criminal prosecution is suspended during the course of the prosecution from the issuance of a warrant until the date of the final disposition of any direct appeal in state court. See Va. Code § 8.01-229K.

Case 7:08-cv-00260-GEC-mfu   Document 75   Filed 02/20/09   Page 19 of 27   Pageid#: 514

need not know with certainty that the suspect is guilty, but only have "facts and circumstances within [his] knowledge . . . sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that [the suspect] ha[d] committed . . . [the] offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

Because Graham's state court appeal is still pending, his claims for false arrest and malicious prosecution are likewise barred under Heck. To maintain a false arrest claim, Graham must demonstrate that there was no probable cause for his arrest. Because Graham's conviction has not been reversed on appeal, a finding by a federal court that his arrest lacked probable cause would necessarily imply the invalidity of his conviction. As such, Heck bars this claim as well.

Likewise, in order for a plaintiff to state a § 1983 malicious prosecution claim for a seizure violative of the Fourth Amendment, the defendant must have been "seized [] pursuant to legal process that was not supported by probable cause and that the criminal proceedings [have] terminated in [plaintiff's] favor . . . ." Brooks v. City of Winston-Salem, 85 F.3d 178, 183-84 (4th Cir. 1996); see Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000). Therefore, Graham's malicious prosecution claim is barred for two reasons. First, a finding by a federal court that the arrest warrants taken out on Graham lacked probable cause would undermine his state convictions and are barred by Heck. Further, Graham cannot, as of yet, make the prima facie showing required for a malicious prosecution claim that his conviction has been overturned.

### C.    Excessive Force

Graham's third § 1983 claim is that the officers' use of excessive force during the arrest violated his Fourth Amendment rights. The United States Supreme Court has held that, "claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . or other

20

'seizure' . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 395 (1989). This requires balancing the intrusion on individual interests against the government interest at stake. Id. at 396. Factors to consider in this analysis include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

The next question to be considered is whether Graham's excessive force claims are also barred by Heck. To the extent that an excessive force claim represents a collateral attack on Graham's criminal convictions, it too is barred by Heck. Cummings v. City of Akron, 418 F.3d 676, 682 (6th Cir. 2005) ("[S]uccess on [Plaintiff's] excessive force claim would necessarily imply the invalidity of his state assault conviction. The struggle between [Plaintiff] and the officers gave rise to both [Plaintiff's] assault conviction and the excessive force claim, and the two are inextricably intertwined.");[10] Hudson v. Hughes, 98 F.3d 868, 872-73 (5th Cir. 1996); Woods v. Cashier, No. 0:05-2211-DCN-BM, 2006 WL 2385275, *8 (D.S.C. Aug. 17, 2006).

In Riddick v. Lott, 202 Fed. Appx. 615, 616-17 (4th Cir. 2006), the Fourth Circuit vacated and remanded dismissal of an excessive force claim under § 1983 as being barred by Heck. Much like this case, Riddick claimed in his pro se complaint that he was subjected to excessive force when a police officer, without provocation, punched him in the face. Like Graham, Riddick pled guilty to assaulting a police officer while resisting arrest. Because Riddick did not appeal his conviction, the district court dismissed the excessive force claim as being

---

[10] The court in Cummings noted further that "Cummings could have raised excessive force as a defense to the assault charge, but instead he chose not to contest the charge." 418 F.3d at 683. The same is true with Graham.

21

barred by Heck because his claim called into question the validity of his conviction, which remained intact.

The Fourth Circuit reversed, finding that it could not determine from the sparse record whether there was a legal nexus between the officer's alleged punch and Riddick's resistance and assault. The court reasoned as followed:

> In this case, the record is sparse. Without knowing the factual basis for Riddick's plea, we cannot determine whether his claim of police brutality would necessarily imply invalidity of his earlier conviction for assaulting an officer while resisting arrest. S.C. Code Ann. § 16-9-320 (2003). It is not clear from Riddick's *pro se* complaint whether the officer's alleged punch preceded, coincided with, or followed Riddick's resistance and assault. If the officer's alleged punch caused Riddick to engage in the conduct that undergirds his conviction, then a successful § 1983 suit would necessarily imply invalidity of that conviction, since a person cannot be found guilty of resisting arrest if he is simply protecting himself, reasonably, against an officer's unprovoked attack or use of excessive force. See State v. Williams, 367 S.C. 192, 624 S.E.2d 443, 445-46 (S.C. App. 2005). If, however, there is no legal nexus between the officer's alleged punch and Riddick's resistance and assault; that is, the alleged punch occurred, independently, either before Riddick resisted arrest, or after his resistance had clearly ceased, then a successful § 1983 suit for excessive force would not imply invalidity of the conviction. See Smith v. City of Hemet, 394 F.3d 689, 697-99 (9th Cir. 2005) (en banc) ("[A] § 1983 action is not barred by Heck unless the alleged excessive force occurred at the time the offense [of resisting arrest] was being committed . . . . [If the officers'] alleged acts of excessive force . . . occurred before or after Smith committed the acts to which he pled, [they] would not invalidate his conviction [for resisting arrest].") (citation omitted).

Riddick, 202 Fed. Appx. at 616-17. Therefore, it is necessary to parse Graham's excessive force claims carefully to see whether these claims arose before or after Graham committed the acts to which he pled guilty.

22

Contrary to the sparse record presented in <u>Riddick</u>, the evidence in this case plainly shows that the allegations of excessive force and Graham's resistance are inextricably intertwined. Graham asserts that he started slapping, scratching and snapping when Gillenwater sat on him. Danner and Dunagan assert that once Danner attempted to handcuff Graham, a nearly half-hour struggle ensued. The officers recount Graham flailing, head butting, kicking and biting them as they rolled down the bank in an effort to restrain him. Plainly, there is legal nexus between the allegations of excessive force and Graham's conduct giving rise to his yet extant convictions. Given the rapid sequence of events in this case, there simply is no way for a court to find that the officers used excessive force without invalidating Graham's resisting arrest, obstruction, assault and malicious wounding convictions. As such, Graham's excessive force claim is likewise barred by <u>Heck</u>. <u>See</u> <u>Woods v. Cashier</u>, No. 0:05-2211-DCN-BM, 2006 WL 2385275, at *7-9 (D.S.C. Aug. 17, 2006).

Additionally, even if the Court were to find that Graham's excessive force claim is not barred by <u>Heck</u> and address this claim on the merits, the undersigned finds and concludes that it is still subject to dismissal. The excessive force claim in this case is analyzed under the Fourth Amendment, which governs claims of excessive force during the course of an arrest, investigatory stop, or other "seizure" of a person. <u>Riley v. Dorton</u>, 115 F.3d 1159, 1161 (4th Cir. 1997) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989); <u>Wilson v. Flynn</u>, 429 F.3d 465, 467 (4th Cir. 2005)). Under the Fourth Amendment, claims of excessive use of force during an investigatory stop or arrest are considered under an "objective reasonableness" standard. This test requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests alleged to justify the instruction." <u>Tennessee v. Garner</u>, 471 U.S. 1, 8

23

(1985); see Sweatt v. State of Maryland, No. 89-3231, 1989 WL 126582, at *1 (4th Cir., Oct. 17, 1989); White v. Town of Chapel Hill, 899 F. Supp. 1428, 1435 (M.D. N.C. 1995), aff'd, 70 F.3d 1264 (4th Cir. 1995). When considering a police officer's action under this "objective reasonableness" standard, the Court must consider the circumstances of the particular case, including the severity of the crime committed, whether the subject posed an immediate threat to the safety of the police officers or others, and whether the subject was actively resisting arrest or attempting to evade arrest. Graham, 490 U.S. at 396; see Foote v. Dunagan, 33 F.3d 445, 447-48 (4th Cir. 1994); Martin v. Gentile, 849 F.2d 863, 869 (4th Cir. 1988). What is objectively reasonable depends on the conditions that exist at the time the alleged excessive force is used, recognizing that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving. Graham, 490 U.S. at 396; see Greenidge v. Ruffin, 927 F.2d 789, 791-92 (4th Cir. 1991).

Here, the evidence shows that the actions taken by the defendants were objectively reasonable. The evidence presented, including Graham's own evidence, plainly shows that at the time of his arrest, he was out of control, and actively resisted being taken into custody, resulting in a prolonged intense battle to restrain him.

The evidence in this case reveals that Graham had been drinking, smoking crack cocaine and not taking his prescribed antipsychotic medications. Plummer testified at the suppression hearing that she went looking for Graham because he ran out of the trailer in a state not really in touch with reality. (Supp. Hrg. 24) Graham himself acknowledged that he had been "drinking and drugging that day" and started hallucinating. (Sent. Hrg. 147) The officers described Graham as being delusional, screaming over and over again that someone was trying to kill him.

24

Graham was running from house to house, banging on the doors and shouting. After seeing the lights of Danner's police car, which had been dispatched to investigate the disturbance caused by Graham, Graham ran across the road, lept a guardrail and scrambled up a bank into a church yard. Graham did not yield to Danner's instructions to stop at first, and when he eventually did get on the ground at Danner's instructions, he repeatedly put his hands in and out of his waistband contrary to instructions from the officers. Concerned for his own safety and that of Graham, Dunagan and Danner determined to cuff Graham, touching off the half-hour fight to get him under control.

Graham makes two specific allegations of excessive force: (1) Officer Gillenwater sat on him causing him not to be able to breathe and forcing him to struggle; and (2) Chief Deputy Dunagan bashed him on the head with his flashlight and fists. As to the first aspect of the excessive force claim, it bears noting that the evidence is clear that Officer Gillenwater was not even at the scene at the time the fight ensued. Thus, there is absolutely no factual basis to Graham's claim that Gillenwater used excessive force by sitting on him. To the extent that another officer who was there, such as Danner or Dunagan, sat on Graham to restrain him, such force can hardly be said to be excessive. By all accounts, including his own, Graham was out of control, first taking flight over a guardrail and up a bank; next refusing the command to stop; then refusing to keep his arms in the open, all the while sweating profusely and screaming that someone was going to kill him. Under these circumstances, the officers, if they did sit on Graham's back, were well justified in doing so in an effort to restrain him.[11]

---

[11] The court does not find credible Graham's assertion that Officer Gillenwater (or another officer) sat on his back causing a problem with his breathing and leading to the ensuing struggle. First, Gillenwater was not even

(continued...)

As to the second aspect of his excessive force claim, the evidence is undisputed that Graham was hit in the head in the midst of this struggle. Those hits were the direct result of Graham's biting Dunagan and the other officers. Dunagan testified that the blows to Graham's face and head were an effort to get Graham to release the bite hold on his arm. The eleven bite marks in Danner's arms and the stitches Dunagan received to treat his bite wounds are testaments to the objective reasonableness of the force applied by the Wythe County deputies in this circumstance. There is no allegation or evidence of any excessive force used by any other officer, nor does the substantial evidentiary record support any such claim. Moreover, given the circumstances of this case, there is no basis for any claim of bystander liability.

The simple fact revealed by the evidence in this case is that Graham was out of control, delusional, extremely hostile and combative, and the officers used reasonable force to try to restrain him. No other conclusion is remotely possible from the evidence in this case. As such, even if the excessive force claim is not barred by <u>Heck</u>, the officers' actions were objectively reasonable in response to Graham's delusions and aggression. Thus, there is no Fourth

---

[11](...continued)
present at the outbreak of the fight and did not arrive for roughly thirty minutes. Second, all of the officers present testified that Graham became combative when Danner touched Graham's hand to handcuff him. Third, no officer recalled anyone sitting on Graham causing him not to breathe. Fourth, Graham states that the fight lasted only five minutes as opposed to the half hour of wrestling it actually took to bring Graham under control. Fifth, Sarah Plummer, who attempted at the suppression hearing to corroborate Graham, was not present throughout the entire scuffle as she went back to her trailer to get her cell phone. It is clear that Graham's recollection of the sequence of events is clouded by delusion occasioned by his drug and alcohol abuse that night and his underlying mental health issues.

Case 7:08-cv-00260-GEC-mfu   Document 75   Filed 02/20/09   Page 26 of 27   Pageid#: 521

Amendment violation.[12] It is, therefore, **RECOMMENDED** that this case be dismissed in its entirety.[13]

The Clerk is directed to transmit the record in this case to Honorable Glen E. Conrad, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court is directed to send copies of this Report and Recommendation to plaintiff and all counsel of record.

Enter this 20ᵗʰ day of _February_ , 2009.

Michael F. Urbanski
United States Magistrate Judge

---

[12] Even if it was determined that excessive force was applied, the officers are entitled to qualified immunity both because there was no violation of Graham's constitutional rights and because it would not be clear to a reasonable officer that the actions taken to restrain the wildly belligerent Graham were unlawful.

[13] By recommending dismissal of this case, this Report and Recommendation addresses all pending motions, namely defendants' motions to dismiss (Docket Nos. 38, 39 and 40), defendants' motions for summary judgment (Docket Nos. 43, 44) and Graham's response (Docket No. 53). It is further **RECOMMENDED** that defendants' motion to dismiss on abstention grounds (Docket No. 37) be **DENIED** as moot.